UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

LAURA CHENEVERT

CIVIL ACTION NO. 12-3096

VERSUS

JUDGE ROBERT G. JAMES

CHRISTUS CONTINUING CARE D/B/A/
CHRISTUS DUBUIS HOSPITAL OF
ALEXANDRIA

MAG. JUDGE JAMES D. KIRK

RULING

This lawsuit was brought by Plaintiff Laura Chenevert ("Chenevert") against her former

employer, CHRISTUS Continuing Care d/b/a Christus Dubuis Hospital of Alexandria

("CHRISTUS") under state and federal law.  Chenevert asserts a workers' compensation

retaliation claim under LA. REV. STAT. 23:1361; disability discrimination, retaliation,  and failure

to accommodate claims under the disability provisions of the Louisiana Employment

Discrimination Law ("LEDL"), LA. REV. STAT. 23:323, *et seq.*, and the Americans with

Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*; and a state whistleblower claim under LA.

REV. STAT. 23:967.

Pending before the Court is CHRISTUS' Motion for Summary Judgment [Doc. No. 19].

For the following reasons, CHRISTUS' Motion for Summary Judgment is GRANTED IN PART

and DENIED IN PART.

I.      BACKGROUND AND PROCEDURAL HISTORY

In 1999, two Catholic charities merged to form CHRISTUS Health, which operates

hospitals in the United States and other countries.  In Louisiana, CHRISTUS operates

CHRISTUS St. Francis Cabrini in Alexandria; CHRISTUS St. Patrick in Lake Charles; and

CHRISTUS Health Shreveport-Bossier.

In 1981, Chenevert began working at St. Patrick Hospital as a staff nurse, prior to its acquisition by CHRISTUS.  About a year later, Chenevert became the charge nurse in the intensive care unit ("ICU") and remained in that position for approximately seven years.  During this time, Chenevert became certified in advanced cardiac life support ("ACLS"), ACLS instruction, and as a critical care registered nurse.  She taught both ACLS and Pedatric Advanced Life Support ("PALS").

In 1986, while the charge nurse, Chenevert hurt her back administering CPR and required ten days of bed rest to recover.

In 1989, Chenevert was again injured while performing CPR, this time necessitating the use of a back brace.  St. Patrick decided that Chenevert could not safely perform the ICU nurse duties and created a case management position for her in the renal department, a position for which she was credentialed, and, according to Chenevert, improved that department's provision of care.

After about a year, Chenevert transferred to the emergency room ("ER"), where she spent half her time as a staff nurse and the other half in quality improvement. Chenevert worked in the ER for about four years.  Although the position addressed her physical limitations, Chenevert continued to perform CPR when needed and to give direct patient care during her twenty hours per week as a staff or charge nurse.  During this time, she also continued to teach ACLS and PALS and took a trauma nurse core course.

In 1994, Chenevert had further health problems, ultimately rupturing a disc in her neck, necessitating surgery and a leave of absence.  She traces this injury to an incident in December 1993 when she moved a patient from an ER stretcher to a hospital bed, but she did not file a

workers' compensation claim for the injury.  Chenvert took six weeks of leave to recover from surgery.  Upon her return, St. Patrick allowed Chenevert to work twenty hours per week performing the administrative or quality improvement aspects of her position.

In 1995, after returning to work in the patient care aspects of her ER position, Chenevert experienced back and neck pain.  A full-time case management position became open, and she was accepted for the position.  The case management position is light duty in terms of physical activity and did not require Chenevert to administer CPR or physically exert herself by bending or lifting.

In 2002, CHRISTUS began operating St. Patrick.  Chenevert was retained and stayed in the case management position, at one point serving as interim director of case management.

In 2007, Chenevert decided to move away from Lake Charles.  She contacted St. Francis Cabrini in Alexandria to inquire whether positions were available.  There were positions available, and she accepted a job as case manager in the long-term acute care ("LTAC") unit, known as CHRISTUS Dubuis.[1]  She had no prior experience in that unit, although she had extensive experience in case management.

Chenevert's case manager duties at CHRISTUS Dubuis included coordinating medical and rehabilitative services for each patient, coordinating clinical team conferences, and acting as a liaison between the medical coverage payer, patient, family, physician, treatment team, and other resources.  She was required to document patient care and communications. This included taking team conference notes for patient files and notes reflecting care discussions with patients and their families.

---

[1] As of 2014, CHRISTUS Dubuis is no longer in operation in Alexandria.

During 2007, 2008, and 2009, Chenevert received positive evaluations and comments from Michelle Hamilton ("Hamilton") and Gary Kempf, the Administrators during those time periods.  However, in June 2008, Hamilton had also given Chenevert a verbal warning about excessive personal telephone calls.

As case manager, Chenevert was required to keep current a case management toolkit. This "toolkit" set forth all the policies and procedures for how to perform the case manager job.

Various reports needed to be completed by Chenevert in her case manager role as well, including items such as "short stay audits."  Short stay audits, completed on patients whose length of stay deviated from the care plan, sought to determine the reasons behind any deviations from the plan.  Chenevert also created an admission/discharge log in a shared file on each patient, which, among other items, included the patient's name, admission date, diagnosis, insurance, length of stay, target dates, disposition, short stay/full stay/over stay, discharge, any changes to the type of stay, total charges, readmission date, and insurance comments.[2]  This log provided some of the same information in the short stay audit and was accessible to Chenevert's supervisor.

 In April 2010, Stephen Peters ("Peters") , the new LTAC administrator, became Chenevert's direct supervisor.  Although Chenevert described Peters as having a "stern" and "controlling" nature, she felt that there were no problems between them prior to May 2011.

During her last year of employment, 2011, Chenevert had problems with Dr. Hong Liu ("Dr. Liu"), a physician who was not an employee of CHRISTUS, but had admitting privileges.

_____

[2]Other items are listed by acronyms which are not defined or explained. [Doc. No. 33-1, ¶ 23].

4

According to Chenevert, Dr. Liu failed to communicate with her and refused to sign discharge planning orders for patients, although he would do so for other nurses.  Chenevert's issues with Dr. Liu allegedly stemmed from her referral of patients to home health agencies other than Stat Home Health, the home health agency for which Dr. Liu served as medical director.[3]  Chenevert reported her problems with Dr. Liu to Peters.  Although Peters never said anything negative to Chenevert about "harassment" reports against Dr. Liu and told Chenevert that he would address the problems,  Peters did not tell Chenevert what action had been taken.

On or about May 20, 2011, Chenevert re-injured her back while assisting a co-worker, Mary Smiley ("Smiley"), who had been hit by a patient.  After two days of bed rest, Chenevert called Peters on Sunday, May 22, 2011, to inform him of the injury.  Peters allegedly informed her to go to the emergency room and use her health insurance, but that he would take care of the workers' compensation claim for her the following day.

Smiley also filed a workers' compensation claim based on the injuries she sustained. Smiley, who was also supervised by Peters, remains employed in her same position as a nurse at CHRISTUS.[4]

Chenevert remained bedridden after the May 20, 2011 injury.  On June 6, 2011, she was admitted to CHRISTUS St. Francis Cabrini Hospital.

---

[3]CHRISTUS was not an owner of, nor did it have a financial stake in, STAT Home Health.

[4]Chenevert "denied" this fact in her Statement of Disputed Material Facts in Opposition to Defendant's Motion for Summary Judgment. [Doc. No. 33-1, ¶86].  In actuality, Chenevert does not contest that Smiley was injured and filed a workers' compensation claim.  Instead, she distinguishes Smiley's situation from her own because Smiley's injury was minor, whereas her injury required surgery and leave time. *Id.*

Peters did not process the workers' compensation claim until June 8, 2011, after

Chenevert reminded him he had to do so.  He completed the Supervisors Occupational Event

Investigation Report on June 13, 2011.

On June 14, 2011, Chenevert was transferred to LSU Medical Center.  Dr. Anil Nanda

performed a lumbar spinal fusion on her the following day.

Joanne Cannatella ("Cannatella"), an adjuster for FARA Insurance Services, the third

party administrator for CHRISTUS Dubuis, investigated and recommended denial of the claim

because of the chronic nature of Chenevert's condition.[5] Cannatella informed Chenevert of the

denial in July 2011.  Chenevert did not pursue an appeal, seek review of the denial of benefits, or

file a Statement of Disputed Claims with the State of Louisiana, although she claims that she

feared for her job.  As a result, Chenevert did not receive workers' compensation benefits in

2011.

Chenevert was eligible for and received short-term disability benefits through

CHRISTUS.  She also took a leave of absence under the Family and Medical Leave Act

("FMLA"), 29 U.S.C. § 2601, *et seq.*

In an August 9, 2011 letter, CHRISTUS reminded Chenevert that her FMLA leave would

expire on August 22, 2011.  CHRISTUS also notified Chenevert that it was not obligated to hold

her position after expiration of her FMLA-protected leave if she did not return to her job.

Although Chenevert was informed by letter that she could apply for an Extended Medical Leave

of Absence, if needed, she alleges that Peters had repeatedly told her that if she did not return to

_____

[5]In a recorded statement given to Canatella, Chenevert said that her back began hurting on
Wednesday prior to the incident with Smiley, and no incident preceded what she described as the
increasing "tightness."  [Doc. No. 42- 1, Exh. 5].

work at the end of her leave, he would post her job as available.

Chenevert did not request extended leave.  She obtained a release from her doctor to return to full duty as of August 22, 2011.

Chenevert's annual evaluation was delayed until on or about October 1, 2011.[6]  On that date, Peters was on leave due to a medical condition of his own, so the evaluation was completed by Kimberly Bennett ("Bennett"), the Care Coordinator.  Bennett did not discuss the evaluation with Peters, and she gave Chenevert a higher evaluation than that given by Peters the previous year.[7]  However, Peters signed the evaluation, as administratively required.

During Chenevert's absence, a former case manager, Lisa Ganey ("Ganey") handled at least some of her duties.[8]  Ganey had been injured in a car accident, and CHRISTUS provided her with a light duty accommodation.[9]  CHRISTUS contends that Ganey's performance was exemplary and that she performed noticeably better than Chenevert.  Chenevert contests that assessment, pointing to the longer length of stay per patient during her absence than when she

---

[6]The evaluation is actually dated September 30, 2011, but the parties both state that the evaluation took place on October 1, 2011. [Doc. No. 33-34].

[7]Chenevert denies that Peters "had given lower marks" for her evaluation in 2010; the Court understands CHRISTUS's factual recitation to mean that Peters had given Chenevert a lower evaluation in 2010 than Bennett gave her in 2011.  To that extent, the evaluations speak for themselves. [Doc. Nos. 19-9 & 33-34].  Peter's total score for Chenevert was 3.33, while Bennett scored Chenevert 3.73.  *Id.*

[8]Chenevert avers that Ganey was not covering all of her duties because the admission/discharge log was incomplete between July and August 2011, when Chenevert returned to work, and it appeared to indicate that Bennett had been handling those duties. [Doc. No. 33-6, ¶ 60].

[9]Chenevert points out that Ganey did not have a workers' compensation injury.

had been in the position.[10]

According to Peters, he had received complaints about Chenevert from doctors as well as patients or their families.  He had also observed problems with her delay in beginning the planning process for a patient to transition out the hospital's care.  He avers that Ganey's performance in Chenevert's absence only highlighted these problems.

However, Peters had not advised Chenevert of these problems, mentioned the alleged complaints to her, or documented his concerns prior to her injury and leave.

Beth Parsons ("Parson"), the Director of Quality and Regional Case Manager, conducted "case management audits" at different CHRISTUS facilties.  In that capacity, she declares that she noticed that Chenevert did not always participate in weekly case management calls.  In a routine audit in October, 2011, she found that Chenevert was missing Medicare notification signatures and that some of her documentation was deficient.  She reported these findings to Peters.  Chenevert denies Parson's statements and points out that these issues were also not documented.

Peters worked with Pam Kennedy, Regional Vice-President Human Resources for CHRISTUS Continuing Care; Traci Richard, Regional Administrator/Vice President Operations for CHRISTUS Continuing Care; and Parsons to develop a detailed Performance Improvement Plan for Chenevert.  The plan's goal was 100% achievement on approximately fifteen areas of concern.  This plan included alleged past problems such as excessive personal phone calls, timely and proper documentation on items such as short stay audits, upkeep of the toolkit, and various

---

[10]Although the length of stay per patient was longer, it was still within an acceptable range, according to CHRISTUS.

alleged deficiencies in Chenevert's collaboration with others.  The plan also expressed the need

for Chenevert to perform her job functions herself, rather than delegating them. The plan initially

provided for a thirty-day progress review.  This plan was given to Chenevert on or about

November 2, 2011.  Chenevert denies that there was any basis for the plan, other than illegal

discrimination, harassment, and retaliation.

Shortly before the Performance Improvement Plan was presented to Chenevert, she

alleges that she had another issue with Dr. Liu.  On or about October 31, 2011, Chenevert claims

that she went to speak to Dr. Liu about a patient who appeared to be stabilizing and might need

home health. [Doc. No. 19-4, Exh. 2 Chenevert Deposition, p. 124].  Because the patient had

Medicare replacement insurance, Chenevert knew that it might take several days to get

authorization for home health services.  Before speaking with him, Chenevert walked up to Dr.

Liu, who was sitting down, and touched his shoulder.  *Id.* at p. 123.  She claims that he

responded by pushing her hand off his shoulder and telling her: "Get out of my face.  I hope you

have a good life." *Id.*; *see also*  [Doc. No. 42-2 Exh. 8, Chenevert's Response to Request for

Admission No. 10].

At some point, Chenevert allegedly reported Dr. Liu for violating the Stark Law, 42

U.S.C. § 1395nn and certain regulations relating to Medicare, namely 42 C.F.R. § 411.1.90.

At the end of the first thirty-day period on the plan, Chenevert was continued on the plan

another thirty days. Parsons met with Chenevert on or about December 2, 2011.  They had lunch

and went over all the items in the plan.  Chenevert contends that Parsons said that she was "doing

nothing wrong" and that she would "do everything in [her] power to make sure that" Chenevert

was not terminated.  [Doc. No. 39, ¶ 47].  Parsons admittedly assured Chenevert that as long as

she did her job, she would not get fired. [Doc. No. 33-4, Exh. 2, p. 61].

At the end of the second thirty-day period, on January 3, 2012, Peters notified Chenevert in his office that she was released from the Performance Improvement Plan. He stated to Chenevert that he had seen improvement in her work.

However, on January 4, 2012, a patient was admitted under the care of Dr. Bruce Barton ("Barton"), the Medical Director at CHRISTUS.  Chenevert and Peters had a dispute as to whether or when the patient should be admitted because the patient required additional surgery. Chenevert wanted to wait.  Peters admitted the patient, but, according to Chenevert, was later upset with her that they had not had more information on the patient's medical condition at the time of admission.

In early January, 2012[11], Dr. Barton, who worked with Chenevert regularly, expressed frustration to Peters about her "continued inability to manage patients, her ongoing habit of waiting to the last minute on certain job responsibilities and [Dr. Barton's] need to calm family members upset by Chenevert." [Doc. No. 19-19, ¶ 7].  However, Dr. Barton's complaints were not documented.

Peters declares that staff reported Chenevert making disparaging comments in the open nurse's station area.  Chenevert denies this accusation and says that two other employees actually approached her about Peters' alleged improper admission of the patient on January 4, 2012.

Peters also observed more difficulties in the relationship between Chenevert and Dr. Liu. Chenevert does not deny a continuing problematic relationship with Dr. Liu, but places the blame

---

[11]Although Dr. Barton's declaration states that he talked with Peters in January 2013, that date appears to be a typographical error because Chenevert was terminated on January 10, 2012. [Doc. No. 19-19, ¶ 7].

on Dr. Liu and CHRISTUS for harassment, discrimination, and retaliation.

Peters contacted Kennedy and asked her whether he should reinstate Chenevert's Performance Improvement Plan in light of these issues.  Kennedy instructed Peters that termination was the appropriate course of action.  Kennedy had no knowledge that Chenevert was upset with Peters about any "delayed" filing of Plaintiff's worker's compensation claim.[12] Peters terminated Chenevert on January 10, 2012.

Peters never said anything negative to Chenevert about her back injury, workers' compensation claim, or leave.  However, Chenevert claims that Peters was "very sharp" when he "threatened" her with termination if she could not return to full duty at the end of her FMLA leave. [Doc. No. 30-10, ¶ 88].

Chenevert never requested any accommodation to perform her job after returning from leave in 2011, although she contends that she was afraid to do so.

Following her termination, Chenevert filed an application for unemployment benefits. CHRISTUS, through its counsel, Erica Moreno, chose not to challenge her application.  Peters testified as a witness since he had been called by Chenevert's counsel, but during questioning did not seem to remember that she had filed a workers' compensation claim.  Chenevert was awarded employment benefits.[13]

Chenevert also filed a Charge of Discrimination with the Equal Employment Opportunity

---

[12]Although Chenevert "denies" this fact, her denial is based on Kennedy's alleged playing "ostrich," rather than evidence that Kennedy had the requisite knowledge. [Doc. No. 30-10, ¶ 84].

[13]The Administrative Law Judge's award of unemployment benefits has no bearing on the issues in this lawsuit.  *See Thomas v. La. Dep't. of Soc. Serv.*, 406 Fed. App'x. 890, 895 (5th Cir. 2010) (citing LA. REV. STAT. § 23:1636).

Commission ("EEOC") on June 30, 2012.  On September 26, 2012, the EEOC issued a Notice of Right to Sue at her request.

Chenevert then filed a Complaint on December 17, 2012, which she later amended. [Doc. Nos. 1 & 9].  CHRISTUS answered the Amended Complaint. [Doc. No. 9].

On October 30, 2014, CHRISTUS filed the instant Motion for Summary Judgment [Doc. No. 19].  Chenevert filed a memorandum in opposition to the motion. [Doc. Nos. 33, 37 & 39]. CHRISTUS filed a reply memorandum. [Doc. No. 42].  Finally, Chenevert filed a sur-reply memorandum. [Doc. No. 47].

On June 26, 2015, the Honorable James T. Trimble, Jr., issued an order of recusal, and the case was assigned to the undersigned on July 2, 2015.  The Court has reviewed all memoranda and supporting evidence and is now prepared to rule.

## II.     LAW AND ANALYSIS

### A.     Standard of Review

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c)(2).  The moving party bears the initial burden of informing the court of the basis for its motion by identifying portions of the record which highlight the absence of genuine issues of material fact. *ACE Am. Ins. Co. v. Freeport Welding & Fabricating, Inc.*, 699 F.3d 832, 839 (5th Cir. 2012) (citing *Celotex Crop. v. Catrett*, 477 U.S. 317, 323 (1986)).  A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute about a material fact is

12

"genuine" if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party.  *Id.*

If the moving party can meet the initial burden, the burden then shifts to the nonmoving party to establish the existence of a genuine issue of material fact for trial.  *ACE Am. Ins. Co*, 699 F.3d at 839.  The nonmoving party must show more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  In evaluating the evidence tendered by the parties, the Court must accept the evidence of the nonmovant as credible and draw all justifiable inferences in its favor.  *Anderson*, 477 U.S. at 255.

### B.      Workers' Compensation Retaliation

First, Chenevert asserts a workers' compensation retaliation claim against CHRISTUS under LA. REV. STAT. § 23:1361(B).

Section 23:1361(B) provides: "No person shall discharge an employee from employment because of said employee having asserted claims for benefits under the provisions of this chapter or under the laws of any state or the United States."  In advancing a claim for retaliatory discharge under the Workers' Compensation Statute, the employee bears the burden of proving by a preponderance of the evidence that she was terminated for asserting a workers' compensation claim.  *Lewis v. Willamette Indus., Inc.*, 537 So. 2d 780 (La. App. 2d Cir. 1989). She may do so "either by presenting direct evidence that the assertion of the workers' compensation claim was the reason for the discharge or by presenting circumstantial evidence sufficient to establish more probably than not that the reason for the discharge was the assertion of the workers' compensation claim."  *Hansford v. St. Francis Med. Ctr.*, No. 43,989 (La. App.

13

2d Cir. 01/14/09); 999 So.2d 1238, 1241-42 (citing *Chivleatto v. Sportsman's Cove, Inc.*, 05-136 (La. App. 5th Cir. 6/28/05), 907 So.2d 815).

In a case where "the employer offers another justification in connection with firing a workers' compensation claimant, the trial court must ascertain the employer's true reason or motive based on the facts presented.  An employer cannot circumvent the statute by stretching the facts out of context or inventing an excuse for firing a compensation claimant." *Id.* at 783.

"Timing of the dismissal alone is insufficient to carry the employee's burden of proof." *Woolsey v. Delta Disposals, L.L.C.*, 40,339 (La. App. 2 Cir. 10/26/05); 914 So.2d 618, 621 (citing *King v. Career Training Specialists, Inc.*, 35,050 (La. App. 2 Cir. 9/26/01); 795 So.2d 1223, 1228).  However, timing may be some evidence of retaliatory motive when presented with additional evidence.  *See King*, 795 So.2d at 1228.  Even so, "[e]mployee fault may be a sufficient independent basis for termination coincident with the employee's filing of a compensation claim." *Woolsey*, 914 So.2d at 622 (citing *Myers v. Omni Hotel, Inc.*, 94-2004 (La. App. 4 Cir. 4/13/95); 654 So.2d 771).

In this case, CHRISTUS moves for summary judgment on the basis that Chenevert was terminated for performance problems, not because of her workers' compensation claim. CHRISTUS points out that Chenevert admits that she was behind on her short stay audits, had failed to update her toolkit, and had not been "up to par" in participating in team conferences. [Doc. No. 19, Exh. 2, Chenevert Deposition, pp. 252, 255, & 263-34].  Additionally, Chenevert was not terminated immediately, but was placed on a Performance Improvement Plan for sixty days.  She was only terminated after she came off the plan, and her supervisor, Peters, received more complaints about her performance.

Additionally, although Chenevert believed that Peters' demeanor changed after her injury, she admits that he never said anything negative about her request for workers' compensation benefits.  CHRISTUS' Human Resources department filed the appropriate paperwork for FARA, the third party administrator, to process her claim.  Since FARA denied the claim and Chenevert did not appeal, she did not even receive workers' compensation benefits.  Smiley, the nurse who was injured on the same day, did receive workers' compensation benefits and remains employed by CHRISTUS. Finally, there is no evidence that Kennedy, the employee who instructed Peters to proceed with termination, had any animus towards Chenevert for filing a workers' compensation claim.

Chenevert does not have direct evidence, but offers several pieces of circumstantial evidence to show that her termination was in retaliation for the filing of a workers' compensation claim.  First, she points out that when she first informed Peters of her work-related injury, he told her to go to the ER and to use her health insurance, assuring her that he would file the workers' compensation claim for her the following Monday, May 23, 2011.  He failed to prepare the paperwork for the claim when promised.  Peters did not do so until June 8, 2011, after Chenevert reminded him.  Although Chenevert acknowledges that Smiley filed a workers' compensation claim and received benefits, her injury was of a much lesser degree and required less leave time.

Moreover, Chenevert points to her work history.  Chenevert had worked as a case manager for approximately sixteen years and had worked for CHRISTUS since 2002.[14]  It is undisputed that Chenevert had received generally positive employment evaluations from prior administrators and from Peters.  Her last performance evaluation, which was also positive, was

---

[14]In total, Chenevert had worked for CHRISTUS and its predecessors for thirty years.

prepared by Bennett at the end of September or beginning of October, 2011, about one month after she returned to work.  Although Bennett prepared the evaluation because Peters was out sick, he signed the evaluation without change or comment.  However, that same October, Peters began preparing a Performance Improvement Plan which he placed her on without warning on November 2, 2011.  After sixty days on the Performance Improvement Plan, on January 3, 2012, Peters removed Chenevert from the plan and specifically told her that her performance had improved.  Only one week later and only five months after she returned to work, Peters terminated Chenevert without further warning.

CHRISTUS has presented legitimate, non-retaliatory reasons for Chenevert's termination, but given the timing, plus the additional circumstantial evidence, the Court finds that she has raised a genuine issue of material fact for trial on her workers' compensation retaliation claim. Although it is undisputed that there were complaints about her performance, those complaints were not documented or acted upon until after Chenevert was injured and sought workers' compensation benefits.  The Court would further note that it is at least arguable that Peters acted as the cat's paw[15] in this scenario.  Kennedy instructed him to proceed with termination, but her decision was based on the complaints and information he presented.  If the jury determined that Peters did have discriminatory animus toward Chenevert because of her claim, it might well determine that the complaints were merely a guise that Peters used to facilitate her termination.

---

[15]"Plaintiffs use a cat's paw theory of liability when they cannot show that the decisionmaker—the person who took the adverse employment action—harbored any retaliatory animus. Under this theory, a plaintiff must establish that the person with a retaliatory motive somehow influenced the decisionmaker to take the retaliatory action. Put another way, a plaintiff must show that the person with retaliatory animus used the decisionmaker to bring about the intended retaliatory action."  *Zamora v. City of Houston*, 798 F.3d 326, 331 (5th Cir. 2015).

While it is not the role of this Court, nor the jury at trial in this matter, to serve as a super-personnel agency, Chenevert has raised a genuine issue of material fact whether her termination was more probably than not a result of her workers' compensation claim.[16]  Therefore, CHRISTUS' Motion for Summary Judgment on this claim is DENIED.

  **C. The ADA and LA. Rev. Stat. § 23:323 Claims**

   **1. Discriminatory Termination**

  Chenevert next raises claims under the ADA, 42 U.S.C. § 12101, *et seq.*, and the LEDL, LA. REV. STAT. § 23:323.  The Fifth Circuit has held that claims brought under LEDL are analyzed using the same framework and precedent as the ADA claims, leading to the same result. *See Wyerick v. Bayou Steel Corp.*, 887 F.2d 1271, 1274 (5th Cir. 1989); *see also Scott v. Turner Indus. Grp., LLC*, 2011 WL 5023840, *4 (M.D. La. Oct. 19, 2011) ("The ADA and LEDL provide similar rights and remedies, such that Louisiana courts routinely reference federal ADA jurisprudence when considering LEDL claims.").

  Under the ADA, a covered employer "shall [not] discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  A "qualified individual" is defined as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires. . . . " 42

---

[16]To this extent, the Court has not relied on testimony from Dr. Howard Riggs and Amy Belgard that Chenevert was a good employee before and after her tenure at CHRISTUS Dubuis. The Court also disregarded the testimony of Chenevert's post-termination counselor, Dr. Darla Gilbert, which is based on hearsay and/or irrelevant to the issues presented in the instant Motion for Summary Judgment.

U.S.C. § 12111(8).  "Disability" is defined as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment (as described in [42 U.S.C. § 12102(3)])."  42 U.S.C. § 12102(1)(A)-(C).

When an ADA plaintiff relies upon circumstantial evidence, the Court applies the traditional *McDonnell-Douglas* burden-shifting analysis.  *See McInnis v. Alamo Cmty. Coll. Dist.*, 207 F.3d 276, 279 (5th Cir. 2000).  "Under this framework, a plaintiff must first make a *prima facie* showing of discrimination by establishing that: (1) [s]he is disabled, has a record of disability, or is regarded as disabled; (2) [s]he is qualified for the job; (3) [s]he was subjected to an adverse employment action on account of h[er] disability; and (4) [s]he was replaced by or treated less favorably than non-disabled employees."  *Id.* at 279-80; *see also Milton v. Tex. Dep't. of Crim. Justice*, 707 F.3d 570, 573 (5th Cir. 2013) (same).  "Once the plaintiff makes h[er] *prima facie* showing, the burden [of production] . . . shifts to the defendant-employer to articulate a legitimate, non-discriminatory reason for the adverse employment action." 207 F.3d at 280.

If the defendant-employer carries its burden of production, "the plaintiff must then offer sufficient evidence to create a genuine issue of material fact either (1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another motivating factor is the plaintiff's protected characteristic (mixed-motive[s] alternative)."  *Rachid v. Jack In The Box, Inc.*, 376 F.3d 305, 312-13 (5th Cir. 2004) (citations and internal quotation marks omitted).

CHRISTUS argues, first, that Chenevert has not presented a *prima facie* case of disability

discrimination.  CHRISTUS assumes for purposes of summary judgment that Chenevert could establish that she has a disability based on her back condition and that she was subjected to an adverse action when she was terminated.  However, CHRISTUS contends that she cannot establish that she was treated less favorably than other non-disabled employees.[17]  That is, CHRISTUS contends that Chenevert cannot show that a non-disabled employee with substantially similar performance issues would have remained employed.

However, CHRISTUS disregards the very test it cites.  Chenevert can also make out a *prima facie* case by showing that she was replaced by a non-disabled person, and CHRISTUS offers no evidence on the status of her replacement.  According to Chenevert's deposition testimony, Ganey is now the case manager.  While she was in a "light duty" position during Chenevert's FMLA leave because she was injured in a car accident, there is no evidence that Ganey is disabled.[18]  Thus, for purposes of summary judgment and given the burden on the moving party, the Court assumes, *arguendo*, that Chenevert has established her *prima facie* case.

The Court next finds that CHRISTUS has met its burden of production by offering evidence to support its legitimate, non-discriminatory reason for Chenevert's termination–her poor job performance.

The burden then shifts back to Chenevert to show that CHRISTUS' proffered excuse is a

---

[17]Although CHRISTUS cites the *Milton* case, CHRISTUS states that the fourth prong requires her to produce evidence that she was "replaced by a non-disabled employee **or some other evidence to give rise to an inference of discrimination.**" [Doc. No. 19-2, p. 15 (citing *Milton*, 707 F.3d at 573) (emphasis added)].  The test is actually as stated by the Court above. Regardless, the issue remains that Chenevert can meet her *prima facie* burden on the fourth prong in either of the two identified ways.

[18]The Court can only assume that if Chenevert had been replaced by a disabled person, CHRISTUS would have provided this favorable evidence.

19

pretext for discrimination or a motivating factor in its decision to terminate.  *Pinkerton v. Spellings*, 529 F.3d 513, 519 (5th Cir. 2008).  A reason is pretextual if it is false, "unworthy of credence," or otherwise unpersuasive.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000). Discrimination is a motivating factor if the disability "actually play[ed] a role in the employer's decision making process and [had] a determinative influence on the outcome."  *Id.*

Based on the same facts discussed above, the Court finds that Chenevert has presented a genuine issue of material fact for trial whether CHRISTUS' proffered reasons for her termination were pretext for discrimination.  Again, it is not merely the timing of events, but the fact that there was no documentation of any performance problems–other than one warning about excessive telephone calls three years earlier[19]–before her May, 2011 injury.  Although the Court finds the evidence less compelling to support Chenevert's ADA claim than her claim of workers' compensation retaliation, she has at least brought forth sufficient evidence to raise a genuine issue as to whether the cited reason for her termination was pretext for discrimination.[20] Therefore, CHRISTUS' Motion for Summary Judgment on this claim is also DENIED.

### 2.      Retaliatory Discharge

Under 42 U.S.C. § 12203(a), "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or

---

[19]It is disingenuous for CHRISTUS to state that "[o]ver the years," Chenevert was counseled for "certain acts such as making excessive phone calls" when that incident appears to be the **only** documented warning. [Doc. No. 19-2, p. 9 (citing Exhibit 6, the June 17, 2008 Write Up Concerning Excessive Personal Phone Calls)].

[20]It is not entirely clear whether Chenevert intends to proceed under a theory of pretext or mixed motive, and this issue will need to be resolved prior to trial.  However, at this point, it is enough that the Court has found a genuine issue of material fact for trial.

because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." (emphasis added). In order to establish a prima facie case of retaliation, a plaintiff must allege (1) that she has engaged in conduct protected by the ADA; (2) that she suffered an adverse action subsequent to engaging in the protected conduct; and (3) that there was a causal link between the protected activity and the adverse action. *Seaman v. CSPH, Inc.*, 179 F.3d 297, 301 ( 1999).

CHRISTUS argues that it is entitled to summary judgment on this claim because, prior to her termination, Chenevert did not either oppose an unlawful act or practice made unlawful by the ADA or somehow participate in an ADA investigation.[21]   Alternatively, CHRISTUS argues that, even if Chenevert had complained about an unlawful act or practice, she cannot show causation.  In its reply memorandum, CHRISTUS points out that Chenevert did not even oppose summary judgment on this claim in its opposition memorandum.

Chenevert disagrees.  In her sur-reply [Doc. No. 47] , she cites pages 22-32 of her own opposition memorandum [Doc. No. 33] as "record evidence of a complaint of disability discrimination."  Presumably, Chenevert relies on the argument in her memorandum that "Peters suddenly chose to harbor animus towards [her] because of her back and/or the workers[']

---

[21]Citing § 12203(b), CHRISTUS also contends that Chenevert has no evidence that she was retaliated against for exercising a right granted or protected under the ADA.  Section 12203 protects retaliation (§ 12203(a)) and coercion or interference (§ 12203(b)).  Although the case law sometimes conflates the two subsections, it does not appear that Chenevert brought an interference claim or that she has any evidence to support such a claim.  As discussed, *infra***,** she did not request a reasonable accommodation, and there is no evidence that she attempted to exercise some other right under the ADA with which CHRISTUS interfered.  Regardless, the analysis would be the same for Chenevert's inteference claim, and the Court would reach the same result–that Chenevert has not raised a genuine issue of material fact for trial under § 12203.

compensation complaint and/or the Medicare fraud complaint and/or the assault and battery by

Dr. Liu." [Doc. No. 33, p. 25.].  She states further in that memorandum that she "complained to

several people" that Peters was harassing her, trying to terminate her, and retaliating against her

"from my back injury."  *Id.*  However, most of the citations in support of her contentions are

either left blank (footnote 156), citations to her own documents (footnote 157), or a citation to

CHRISTUS' memorandum (footnote 158).

Chenevert does cite testimony from Parsons and Bennett.  In the only deposition

testimony Chenevert cites from Parsons, Parsons testified that there is a requirement at

CHRISTUS to report discrimination, retaliation, or harassment in the workplace.  One of the

pages of Bennett's cited testimony was not provided to the Court.  On the other pages of her

deposition, Bennett testified that Chenevert called her at home, "sobbing about how she was

worried about her job and what she could do better." [Doc. No. 33, Exh. 2, p. 28].  Chenevert

"felt like [Peters] was out to get her job, that he was going to fire her."  *Id.*  Finally, Bennett

testified that she personally believed that Chenevert did "a good job" and that she had improved.

*Id.* at p. 78.

According to Chenevert's own testimony, she made complaints to Parsons and  Bennett

about Peters' treatment of her.  She claimed then that Peters had placed her on the Performance

Improvement Plan because she had filed a workers' compensation claim and, later, that he was

angry over their disagreement about the admission of a patient.

Viewing this evidence in the light most favorable to Chenevert, she has not presented

evidence that she opposed an act or practice made unlawful by the ADA or somehow participated

in ADA proceedings.  No doubt Chenevert complained to Parsons and Bennett about Peters, but

none of those complaints were about a matter protected by § 12203 of the ADA.  Chenevert offered no other evidence to support this claim.[22]  Accordingly, CHRISTUS' Motion for Summary Judgment on Chenevert's ADA retaliation claim is GRANTED, and this claim is dismissed with prejudice.

### 3.   Failure to Accommodate

The ADA also protects an employee from disability discrimination based on a covered employer's failure to make "reasonable accommodations to the known physical and mental limitations of an otherwise qualified individual with a disability . . . unless such covered [employer] can demonstrate that the accommodation would impose undue hardship . . . ." 42 U.S.C. § 12112(b)(5)(A).  To establish a claim of failure to accommodate, Chenevert must show that (1) she "is a 'qualified individual with a disability;' (2) the disability and its consequential limitations were 'known' by the covered employer; she was qualified for the job; and (3) the employer failed to make 'reasonable accommodations' for such known limitations." *Feist v. La., Dep't of Justice, Office of the Atty. Gen.*, 730 F.3d 450, 454 (5th Cir. 2013).  Once an employee makes a request for reasonable accommodations, the employer is obligated by law to engage in an "interactive process" or "a meaningful dialogue with the employee to find the best means of accommodating that disability." *E.E.O.C. v. Chevron Phillips Chem. Co., LP*, 570 F.3d 606, 621 (5th Cir. 2009) (internal quotation marks and citation omitted). Such reasonable accommodations may include job restructuring.  42 U.S.C. § 12111(9).

If an employer does not engage in a good faith interactive process, and the failure to do so "*leads to* a failure to reasonably accommodate an employee, the employer violates the ADA."

---

[22]The Court need not reach CHRISTUS' argument on the lack of causation.

23

*Silva v. City of Hidalgo, Tex.*m 575 Fed. App'x. 419, 424 (5th Cir. 2014) (quoting *Loulseged v. Akzo Nobel Inc.*, 178 F.3d 731, 736 (5th Cir. 1999) (emphasis in original) (internal quotation marks omitted)); *see also* 570 F.3d at 621.  However, "an employer cannot be found to have violated the ADA when responsibility for the breakdown of the 'informal, interactive process' is traceable to the employee and not the employer."  *Griffin v. United Parcel Serv., Inc.*, 661 F.3d 216, 224 (5th Cir. 2011) (quoting *Loulseged*, 178 F.3d at 736).

In this case, Chenevert returned to work on August 22, 2011, with a full release from her doctor.  Although she contends that she requested a full release because of a fear of losing her job, CHRISTUS is not required under the ADA to read her mind and certainly not to ignore the medical release.  She admitted in her deposition that she never requested a reasonable accommodation.[23]  She again cited a fear of losing her job and pointed out that she was in a back brace.  However, without a request or any other information from Chenevert or her doctor, CHRISTUS cannot have actually "known" of the limitations for which she required an accommodation.  Further, as CHRISTUS points out, as Chenevert admits, her job itself was already a light duty position, and she was performing the job.[24]  Finally, to the extent that an

---

[23]During her deposition, Chenevert testified as follows:

Q:      . . . And so at any point in time after returning in late August 2011 until you left, did you ever ask the company to make any accommodations or give you any accommodations so that you could do your job?

A:     They knew I was in a back brace.  They had Lisa Ganey work with me for the first week when I came back, but asking for accommodations, I was already afraid I would lose my job because I was told to come back with a full release.

[Doc. No. 19-4, Exh. 2, p. 235].

[24][Doc. No. 19-4, Exh. 2, pp. 226-27, 241].

extension of her leave might have been a reasonable accommodation, she never requested an extension.[25]  Under these circumstances, there is no genuine issue of material fact for trial. Accordingly, CHRISTUS' Motion for Summary Judgment on Chenevert's failure to accommodate claims is GRANTED, and this claim is DISMISSED WITH PREJUDICE.

### D. Whistleblower Statute

Finally, Chenevert claims that CHRISTUS violated La. Rev. Stat. 23:967, Louisiana's Whistleblower Statute, which provides:

> A. An employer shall not take reprisal against an employee who in good faith, and after advising the employer of the violation of law:
>
> (1) Discloses or threatens to disclose a workplace act or practice that is in violation of state law.
>
> (2) Provides information to or testifies before any public body conducting an investigation, hearing, or inquiry into any violation of law.
>
> (3) Objects to or refuses to participate in an employment act or practice that is in violation of law.

LA. REV. STAT. § 23:967(A).  The statute further states that an employee aggrieved by a practice prohibited by subsection A may bring an action for damages against her employer. See LA. REV. STAT. § 23:967(B).

Here, Chenevert alleges that she reported Dr. Liu for violation the federal Stark Laws and that she complained to supervisors and superiors at CHRISTUS about Dr. Liu's Medicare fraud

---

[25]Under the ADA, courts "confronted" with a request for extended indefinite leave "routinely deny the reasonableness of such accommodations." *Reed v. Petroleum Helicopters, Inc.*, 218 F.3d 477, 481 (5th Cir. 2000).  The Fifth Circuit does not appear to have addressed the issue of whether an extension of leave for a **specific, limited** duration could be a reasonable accommodation under certain circumstances.  Regardless, in this case,  Chenevert never made such a request.

and harassment.[26]  CHRISTUS moves for summary judgment, contending that the Whistleblower

Statute provides protection to an employee if she disclosed or threatened to disclose an act or

practice in violation of **state**, not federal, law.

A federal court sitting in diversity must apply the substantive law of the state.  *Erie R. Co.*

*v. Tomkins*, 304 U.S. 64 (1938).  The Louisiana Supreme Court has not addressed this issue, but

the only state appellate court to do so has, on two occasions, concluded that the Whistleblower

Statute provides protection for reports or threatened reports of violations of state law only.  In

*Hale v. Touro Infirmary*, 04-0003 (La. App. 4 Cir. 11/3/04), 886 So.2d 1210, *writ denied*,

05-0103 (La. 3/24/05), 896 So.2d 1036, this issue was presented to the state Fourth Circuit as a

matter of first impression.  The *Hale* Court stated:

> We further agree that the violation of law in question must be that of a state
> statute. The first subsection detailing under what circumstances an employer may
> not take "reprisals" clearly states that the employee must be aware of a violation
> of state law. The two subsequent subsections prohibit reprisals against employees
> who not only know of the violation and report it to their employers, but who also
> testify before public bodies or simply refuse to participate in the illegal activity.
> Although the language of the statute is inconsistent, the interpretation that is
> supported by the structure and that fits best into the framework of the statute is
> one that holds the statute to its most specific terms, i.e., violations of state law
> only.

*Id.* at 1216 (footnotes omitted).  When presented with this issue a second time, in *Beard v.*

*Seacoast Electronics, Inc.*, No. 2006-CA-1244 (La. App. 4 Cir. 01/24/2007), 951 So.2d 1168, the

Fourth Circuit cited to and quoted its earlier decision in *Hale*, finding that decision to be "directly

on point and, therefore, . . . binding precedent on this court."  *Id.* at 1170.  Although the Fourth

---

[26]To the extent that Chenevert claims she was terminated because of her workers'
compensation claim, that claim is addressed separately and cannot serve to support a claim under
the Whistleblower Statute.  *See* [Doc. No. 33, p. 25].

Circuit noted federal decisions to the contrary, those decisions predated *Hale*.

Under *Erie*, this Court must attempt to discern how the Louisiana Supreme Court would rule on this issue.  The only state appellate court to address the issue has held consistently that the statute applies to violations of state law only.  While the Fourth Circuit's decisions are not binding, the Court finds them to be persuasive.  Though this Court certainly does not condone a violation of any law, the Whistleblower Act does not provide Chenevert with a cause of action for her alleged reports of violations of federal law, specifically Medicare regulations or the Stark Law.

Finally, the Court has considered Chenvert's arguments that she did, in fact, allege a violation of state law.  Chenevert's memoranda have no headings and are somewhat difficult to follow.  In her opposition memorandum, she points to her complaints about Dr. Liu's alleged verbal and emotional "harassment," citing cases relating specifically to sexual harassment.  Discrimination and harassment based on sex or gender are prohibited under state law, but Chenevert does not bring a state law claim for sexual harassment in this lawsuit and does not claim that she reported Dr. Liu's alleged harassment to be of a sexual or gender-based nature.  Further, in her sur-reply memorandum, Chenevert claims that she "'specifically articulate[d] [a] 'workplace act or practice' that could be a violation of Louisiana law,'" but does not identify the state law.  [Doc. No. 47, p. 24 (quoting *Hale*, 886 So.2d at 1216)].  Apparently, Chenevert refers to her statement in her opposition memorandum that Dr. Liu committed assault and battery, a violation of state law.  This alleged assault and battery claim could only arise from the October 31, 2011 incident when Dr. Liu pushed her hand off his shoulder.[27]  Again, Chenevert has not

---

[27]Based on Chenevert's own version of events, it would appear that Dr. Liu actually removed her offensive touch from his shoulder.  Thus, even if this incident was disclosed to

presented sufficient evidence to show that CHRISTUS was placed on notice that Dr. Liu's alleged behavior was a violation of state law or that she disclosed or threatened to disclose this alleged violation of state law prior to her termination.  Accordingly, to the extent that she is relying on her complaints about Dr. Liu's behavior to constitute a violation of state law, Chenevert has also failed to raise a genuine issue of material fact for trial under the Whistleblower Statute.

Thus, CHRISTUS' Motion for Summary Judgment on Chenevert's whistleblower claim is also GRANTED, and this claim is DISMISSED WITH PREJUDICE.

## III.   CONCLUSION

For the foregoing reasons,  CHRISTUS'  Motion for Summary Judgment [Doc. No. 19] is GRANTED IN PART and DENIED IN PART.  To the extent that CHRISTUS moves for summary judgment on Chenevert's claims for retaliatory discharge and the failure to provide a reasonable accommodation under the ADA and for retaliation under the Whistleblower Statute, the motion is GRANTED, and those claims are DISMISSED WITH PREJUDICE.  The motion is otherwise DENIED.

MONROE, LOUISIANA, this 21st day of October, 2015.

_____

**ROBERT G. JAMES**
**UNITED STATES DISTRICT JUDGE**

_____

CHRISTUS, the Court cannot say that it should have been on notice that Dr. Liu committed a violation of state law.